# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1723V

| | |
|---|---|
| ADRIANA MERINO, | UNPUBLISHED |
| Petitioner, | Special Master Katherine E. Oler |
| v. | Filed: September 20, 2022 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | Final Attorneys' Fees and Costs; Reasonable Basis |
| Respondent. | |

*Andrew D. Downing*, Downing, Allison & Jorgenson, Phoenix, AZ, for Petitioner
*Emily H. Manoso*, U.S. Department of Justice, Washington, DC, for Respondent

## DECISION GRANTING PETITIONER'S MOTION FOR ATTORNEYS' FEES AND COSTS[1]

On November 6, 2019, Joanna Farjaszewska ("Ms. Farjaszewska") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq.*[2] (the "Vaccine Act" or "Program") on behalf of her daughter, Adriana Merino ("Petitioner"), alleging that Petitioner developed "various symptoms," including "electric-like shocks" in her arms, interstitial cystitis, disruptions in her menstrual cycle, headaches, stomach aches, anxiety, depression, heart palpitations, ear popping, and numbness and tingling on the left

---

[1] This Decision will be posted on the United States Court of Federal Claims' website, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 (2012). **This means the Decision will be available to anyone with access to the internet.** As provided in 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the Decision's inclusion of certain kinds of confidential information. To do so, each party may, within 14 days, request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, this Decision will be available to the public in its present form. Id.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

1

side of her face as a result of the human papillomavirus ("HPV") vaccinations she received on November 7, 2016, August 8, 2017, and February 15, 2018. ECF No. 1 at 2 (hereinafter "Pet.").

On August 11, 2021, Petitioner filed a motion for a decision dismissing her petition. ECF No. 31. I granted the motion and dismissed the petition on August 12, 2021. ECF No. 32.

Petitioner now moves for an award of attorneys' fees and costs. For the reasons discussed below, I find that the petition successfully articulates a reasonable basis; accordingly, Petitioner's motion is granted.

## I.     Procedural History

On November 6, 2019, Ms. Farjaszewska filed a pro se petition on behalf of her daughter. On September 13, 2020, and October 6, 2020, Petitioner filed medical records (Exs. 1-8). Petitioner also filed a Statement of Completion on October 6, 2020. ECF No. 24.

On July 29, 2020, Mr. Downing was substituted in as counsel of record.

On January 4, 2021, Respondent filed his Rule 4(c) Report arguing that compensation was not appropriate in Petitioner's case. ECF No. 26. Respondent argued that Petitioner merely listed the various symptoms she had experienced since receiving the HPV vaccine and that she had failed to allege a specific injury. *Id.* at 8.

On August 11, 2021, Petitioner filed a motion for a decision dismissing her petition, indicating that "[s]he wishes to pursue a third-party action in district court against Merck directly." Pet'r's Mot., ECF No. 31 at 2. Petitioner's motion notes that "Petitioner simply needs a judgment from the Vaccine Program so that she may reject said judgment and submit her election to opt out." *Id.* I granted the motion and dismissed the petition on August 12, 2021. ECF No. 32.

On August 17, 2021, Petitioner filed her election to file a civil action pursuant to 42 U.S.C. § 300aa-21(a). ECF No. 35. On November 30, 2021, Petitioner filed her motion for attorneys' fees and costs (ECF No. 39; hereinafter "Fees App.") and medical literature in support of her claims (Exs. 10-15). Respondent filed his response in opposition (hereinafter "Fees Resp.") on December 14, 2021. ECF No. 40. Petitioner filed her reply (hereinafter "Fees Reply") on December 20, 2021. ECF No. 41. Petitioner filed her quarterly motion for attorneys' fees and costs with a supplemental invoice on December 30, 2021. ECF No. 42 (hereinafter "Supp. App.").

This matter is now ripe for adjudication.

## II.    Petitioner's Relevant Medical History

On January 10, 2015, Petitioner saw Abraham D. Lopez, PA, complaining of lower back pain that had persisted for about two days. Ex. 8 at 42. Petitioner denied having fallen and stated that the pain became worse with movement and bending over. *Id.* After a normal x-ray, Petitioner received a diagnosis of lumbar sprain and a prescription for Flexeril and Motrin. *Id.* at 44.

On November 24, 2015, Petitioner saw Daryl Marcelo, DO, her regular pediatrician, for upper abdominal pain that had persisted for one month. Ex. 1 at 33. Petitioner stated that she experienced pain on and off throughout the day and that she felt nauseous after eating. *Id.* Dr. Marcelo diagnosed Petitioner with epigastric pain and prescribed Prilosec, counseling Petitioner to limit her intake of fatty foods. *Id.* at 34.

On October 12, 2015, Petitioner saw pulmonologist Rupali Drewek, MD, complaining of a cough that had started a year earlier. Ex. 6 at 75. She showed normal lung function and no signs of active infection. *Id.* at 77. Dr. Drewek diagnosed Petitioner with moderate persistent asthma and prescribed Advair and albuterol. *Id.*

On October 15, 2015, Petitioner saw Judy O'Haver, PNP, for a dermatology consultation regarding recurring pimples on her buttocks over several years. Ex. 6 at 55. She also complained of a lesion on her abdomen that would come and go but was not visible during Nurse O'Haver's examination. *Id.* at 55-56. Nurse O'Haver diagnosed Petitioner with folliculitis and prescribed Cleocin, hydrocortisone cream, Bactroban, and Benzac. *Id.* at 56-57.

On August 10, 2016, Petitioner returned to Dr. Marcelo complaining of back pain and shoulder pain that was more severe in the right shoulder. Ex. 1 at 29-30. Dr. Marcelo advised Petitioner to rest and limit her activity and referred her to a physical therapist. *Id.* at 30.

On November 7, 2016, Petitioner saw Dr. Marcelo again for a well child visit. Ex. 1 at 23. She received the first dose of the HPV vaccine in her right deltoid. Ex. 1 at 25.

On December 6, 2016, Petitioner saw Dr. Marcelo again, complaining of pain in both breasts, a "bump" at the vaccine injection site, "shooting burning pain randomly throughout [her] body," and urinary frequency. Ex. 1 at 20. Dr. Marcelo diagnosed Petitioner with mastodynia, frequency of micturition, and nontraumatic hematoma of soft tissue ("[l]ikely due to vaccination"). *Id.* at 21.

On February 20, 2017, Petitioner saw Dr. Marcelo again, this time for irregular menstrual cycles, painful, itchy discharge, and a cough. Ex. 1 at 17. Petitioner received a diagnosis of dysuria, acute vaginitis, and pneumonia. *Id.* at 18. At her March 29, 2017 follow-up with Dr. Marcelo, Petitioner's symptoms were ongoing. *Id.* at 14-15.

On March 31, 2017, Petitioner saw Dr. Marcelo's colleague, Genaya Titterington, PA, complaining that her painful urination continued. Ex. 1 at 11. On May 15, 2017, Petitioner saw Dr. Marcelo again for continuing chest pain and congestion, cough, dysuria, and vaginal burning. *Id.* at 8. Dr. Marcelo referred Petitioner to a gynecologist. *Id.* at 9.

On June 6, 2017, Petitioner returned to Dr. Marcelo's office complaining of respiratory symptoms, including cough and chest congestion. Ex. 1 at 6. Dr. Marcelo prescribed Cefdinir and referred Petitioner to a pulmonologist. *Id.* at 7. Petitioner saw pulmonologist Dr. Drewek again on June 8, 2017. Ex. 6 at 35. Dr. Drewek diagnosed her with moderate persistent asthma that had been "suboptimally controlled." *Id.*

3

On June 5, 2017, Petitioner saw a gynecologist, Gary Newman, DO, complaining of a follicular cyst, abnormal vaginal discharge, pelvic pain, and abnormal vaginal bleeding. Ex. 2 at 2. Dr. Newman referred Petitioner to a urologist. *Id.* at 4. Petitioner saw urologist Ben O. Donovan, MD, on June 16, 2017, for her persistent dysuria, pelvic and perineal pain, and urgent urination. Ex. 5 at 14. Dr. Donovan ordered an ultrasound and cystoscopy, both of which were normal. *Id.* at 13, 19.

On August 8, 2017, Petitioner received the second dose of the HPV vaccine in her left arm. Ex. 1 at 4. Petitioner saw Lipika McCauley, MD, for a urology appointment on August 24, 2017. Ex. 5 at 8. Petitioner complained of dysuria, pelvic and perineal pain, and urgency of urination, but indicated that she was "doing much better" on Uribel. *Id.* Dr. McCauley's impression was of interstitial cystitis and dysfunctional pelvic floor, and she referred Petitioner for pelvic physical therapy. *Id.* at 9-10. At a follow-up with Dr. McCauley on November 28, 2017, Petitioner reported that the physical therapy had "really helped with [her] pelvic pain," but that she was still experiencing diffuse abdominal pain. *Id.* at 5.

Petitioner saw gynecologist Heather Lesmes, MD, on October 20, 2017, to discuss a prescription for birth control. Ex. 2 at 5. Petitioner also complained of pelvic pain lasting about two months. *Id.* Dr. Lesmes prescribed oral contraceptive pills and ran a screening for sexually transmitted infection. *Id.* At a follow-up on November 17, 2017, Petitioner reported no change in her pelvic pain since beginning oral contraceptives, and that the pain was not related to her menstrual cycle, which had been irregular. *Id.* at 8. Dr. Lesmes found that Petitioner's ovaries, fallopian tubes, and uterus were normal, and an ultrasound revealed no pelvic fluid. *Id.* at 9. The lack of fluctuation in her pain with her menstrual cycle made endometriosis unlikely. *Id.*

On February 15, 2018, Petitioner received the third dose of the HPV vaccine in her right deltoid. Ex. 1 at 2. Petitioner saw gastroenterologist Chirag Trivedi, DO, on February 28, 2018, complaining of abdominal pain that had lasted for about six months, heartburn, nausea, and vomiting. Ex. 3 at 11. Dr. Trivedi prescribed Protonix. *Id.* at 13.

On March 18, 2018, Petitioner reported to the emergency room complaining that her abdominal pain had worsened that day, and that she had experienced nausea and dry heaves. Ex. 8 at 142. She further reported that her pelvic cramping extended through her legs and feet, and that she felt dizzy, presyncopal, and jittery. *Id.* at 142-43. Her CT scan and ultrasound were both normal. *Id.* at 147.

Petitioner saw Dr. Trivedi again on March 21, 2018. Ex. 3 at 8. Dr. Trivedi increased her dosage of Protonix and arranged for an upper endoscopy. *Id.* at 9. Petitioner underwent the upper endoscopy on April 19, 2018. Ex. 8 at 224. Her esophagus, stomach, and duodenum were all normal, and the pathology report indicated mild chronic gastritis with no infection. *Id.* at 212-13.

On May 1, 2018, Petitioner saw Dr. Trivedi again for continuing epigastric pain which became worse after eating, particularly spicy and tomato-based foods. Ex. 3 at 5. She indicated that her symptoms were also made worse by stress and anxiety. *Id.* Petitioner admitted that she had taken the prescribed Protonix only 95% of the time. *Id.* Petitioner's mother, Ms. Farjaszewska, told Dr. Trivedi for the first time that Petitioner had had stomach issues and blood in her stool

4

when she was an infant. *Id.* Colonoscopies at 18 months and three years of age were both negative. *Id.* Dr. Trivedi noted that Petitioner's symptoms seemed to be secondary to stress and anxiety, and he ordered an abdominal ultrasound. *Id.* at 7. The ultrasound was negative for biliary pathology. *Id.* at 2. Dr. Trivedi noted that Petitioner met the ROME criteria for irritable bowel syndrome, alternating type, and prescribed Bentyl. *Id.* at 3.

On July 30, 2018, Petitioner saw Patrick Nemechek, DO, complaining of bladder and stomach issues, as well as "mental health challenges." Ex. 4 at 42. Dr. Nemechek noted that Petitioner's "[HPV] vaccine trigger[ed] bacterial overgrowth," which included intolerance to spicy foods and tomatoes. *Id.*

On August 28, 2018, Petitioner went to the emergency room with a headache and numbness in her face that had lasted about 18 hours. Ex. 8 at 280. The nurse noted in Petitioner's chart that Petitioner's mother suspected that Petitioner's problems were related to the HPV vaccine that she received in 2016. *Id*. An x-ray of Petitioner's cervical spine was normal. *Id*. at 282.

Petitioner followed up with Dr. Nemechek on October 29, 2018, and February 4, 2019. Ex. 4 at 38-39. Both times, her condition was unchanged. *Id.*

On June 24, 2019, Petitioner went back to the emergency room complaining of pelvic pain, burning on urination, itching, and white discharge. Ex. 8 at 352. She returned to the emergency room on December 31, 2019, with abdominal pain, nausea, vomiting, and diarrhea. *Id.* at 448. Petitioner received a diagnosis of viral gastroenteritis. *Id.*

On an unspecified date prior to October 6, 2020, Petitioner consulted with Rita Kara Robinson, a homeopathic provider whose credentials are not specified. Ex. 7 at 2. Ms. Robinson took Petitioner's medical history, concluding that Petitioner's reactions to each dose of the HPV vaccine included a bump at the injection site, deterioration of health, mental health concerns, pain, abnormal menstrual cycle, and neurological symptoms. *Id.* at 17-18.

No other pertinent medical records have been filed.

### III.   Ms. Farjaszewska's Affidavit

Petitioner's mother, Joanna Farjaszewska, filed a statement after Petitioner dismissed her case, stating that, since Petitioner's first dose of the HPV vaccine when she was 17 years old, Petitioner's "life, health, and outlook on her life has [sic] never been the same." Ex. 9 at 1. Ms. Farjaszewska stated that some physicians that Petitioner had seen "felt like the HPV vaccination was responsible" for Petitioner's health issues. *Id.*

### IV.   Medical Literature

Petitioner filed the following medical literature.

5

### A. HPV Vaccine Package Insert (Ex. 10)

The package insert for the HPV vaccine (brand name "Gardasil") contains the manufacturer's information about the vaccine for use by medical providers, including indications and usage, dosage, and adverse reactions. Ex. 10 at 1. The authors describe the adverse reactions observed during clinical trials, listing each symptom and how many patients in the testing group reported it. *Id.* at 5-9. The package insert specifically notes the following post-vaccination reactions: "headache, nausea, dizziness, myalgia, abdominal pain." *Id.* at 6.

### B. Manuel Martinez-Lavin, *Hypothesis: Human papillomavirus vaccination syndrome – small fiber neuropathy and dysautonomia could be its underlying pathogenesis*, 34 CLINICAL RHEUMATOLOGY 1165 (2015) (EX. 11)

This paper discusses and provides support for the hypothesis that small fiber neuropathy and dysautonomia may be the underlying pathogenesis of certain rare reactions to the HPV vaccine. Ex. 11 at 1165 (hereinafter "Martinez-Lavin"). The author states that there have been documented cases of complex regional pain syndrome (CRPS), postural orthostatic tachycardia syndrome (POTS), and fibromyalgia following HPV vaccination. *Id.* The author notes that there is a significant degree of clinical overlap among these three conditions, making them difficult to diagnose. *Id.* The article proposes that, in some patients, the HPV vaccine triggers small fiber neuropathy that leads to pain and autonomic dysfunction. *Id.* at 1167.

### C. Brinth, et al., *Orthostatic intolerance and postural tachycardia syndrome as suspected adverse effects of vaccination against human papilloma virus*, 33 VACCINE 2602 (2015) (Ex. 12)

This paper reports on a cohort of 35 patients who received the HPV vaccine and later reported orthostatic intolerance. Ex. 12 at 2602 (hereinafter "Brinth"). Of the 35, 21 fulfilled the criteria for postural orthostatic tachycardia syndrome (POTS). *Id.* Symptoms included orthostatic intolerance, nausea, chronic headache, fatigue, cognitive dysfunction, segmental dystonia, and neuropathic pain. *Id.* Patients reported that their symptoms began to appear after the first dose of the HPV vaccine in 24% of cases, after the second dose in 51% of cases, and after the third dose in 25% of cases. *Id.* at 2604. The authors noted that there was "remarkable consistency in the reported symptoms and in the hemodynamic responses to the upright posture." *Id.* at 2605. The authors conclude by noting that the "findings do not confirm or dismiss a causal link to the HPV-vaccine but suggest that further research is urgently warranted." *Id.*

### D. Kinoshita et al., *Peripheral Sympathetic Nerve Dysfunction in Adolescent Japanese Girls Following Immunization with the Human Papillomavirus Vaccine*, 54 INTERNAL MEDICINE 1955 (2014) (Ex. 13)

This article reports on a cohort of 40 patients who reported symptoms shortly after receiving the HPV vaccine. Ex. 13 at 1955 (hereinafter "Kinoshita"). Symptoms reported included headaches, general fatigue, coldness of the legs, limb pain, limb weakness, difficulty getting up, and orthostatic fainting, decreased ability to learn, arthralgia, limb tremors, gait disturbances, disturbed menstruation, and dizziness. *Id.* at 1956. Four of the patients met the Japanese clinical

6

criteria for complex regional pain syndrome (CRPS), and another 14 met foreign criteria for CRPS. *Id.* at 1. The authors concluded that abnormal peripheral sympathetic responses would explain the symptoms they observed. *Id.*

### E. S. Blitshteyn, *Postural tachycardia syndrome following human papillomavirus vaccination*, 21 EUR. J. OF NEUROLOGY 135 (2014) (Ex. 14)

This paper presents case reports of six previously healthy patients who began experiencing symptoms after receiving the HPV vaccine. Ex. 14 at 135 (hereinafter "Blitshteyn"). Symptoms reported included dizziness, exercise intolerance, syncope, and pre-syncope, among others. *Id.* at 136. All six patients were diagnosed with postural orthostatic tachycardia syndrome (POTS). *Id.* at 138. The authors suggest that possible pathogenesis of POTS after HPV vaccination may be molecular mimicry. *Id.* Furthermore, "induction of lymphocyte activation and a broad spectrum of cytokine responses elicited by the HPV vaccine may also be involved." *Id.* The authors also noted that two of the six patients "experienced significant symptomatic exacerbation following a re-challenge with a subsequent Gardasil injection," suggesting that each successive dose elicited a greater immune response. *Id.*

### F. Ozawa, et al., *Suspected Adverse Effects After Human Papillomavirus Vaccination: A Temporal Relationship Between Vaccine Administration and the Appearance of Symptoms in Japan*, 40 DRUG SAFETY 1219 (2017) (Ex. 15)

This article summarizes a study whose goal was to "clarify the temporal relationship between [HPV] vaccination and the appearance of post-vaccination symptoms." Ex. 15 at 1219 (hereinafter "Ozawa"). Of the original cohort of 163 patients studied, 30 were determined to have vaccine-related symptoms and a further 42 were found to have probable vaccine-related symptoms. *Id.* The authors established new diagnostic criteria for adverse events related to the HPV vaccine for the purposes of this study, which have not been independently validated. *Id.* at 1221. The authors noted that the time between the first dose of the vaccine and the onset of symptoms was variable among these patients. *Id.* at 1227.

No other medical literature has been filed.

### V. Parties' Arguments

Petitioner argues in her motion that she had a good faith belief that she had been injured by the HPV vaccine. Fees App. at 2. She notes that her medical records show that during an August 28, 2018 visit to the emergency room, her mother, Ms. Farjaszewska, asked a nurse to note in Petitioner's chart that Ms. Farjaszewska believed Petitioner's symptoms to be related to the vaccine. Ex. 8 at 280. Petitioner further points out that her decision to dismiss her Vaccine Program case and sue the vaccine manufacturer directly is evidence of her belief that the vaccine caused her injury. Fees App. at 3.

Petitioner argues that she had a reasonable basis for filing her petition because her medical records and the medical literature support her claim of a causal link between the HPV vaccine and the symptoms she experienced. Fees App. at 3. In particular, she refers to the comment by Dr.

Nemechek that she has a "history of [HPV] vaccine triggering bacterial overgrowth…urinary dysuria, urgency, abdominal cramping, orthostatic intolerance and some mild depression." *Id.* (quoting Ex. 4 at 33). She also cites to notes about her medical history by Rita Kara Robinson, the homeopathic provider with whom she consulted. *Id.*

Petitioner cites to the vaccine package insert (Ex. 10), arguing that she experienced several of the symptoms listed in the insert as potential adverse reactions, including fatigue, headache, nausea, dizziness, abdominal pain, and myalgias. Fees App. at 4.

Petitioner further argues that she experienced seven of the 10 "major symptoms" on the list of diagnostic criteria for HPV vaccine-related adverse reactions devised by Ozawa and colleagues, thus meeting the criteria for a "probable" vaccine-related injury. Fees App. at 5-6.

Petitioner also argues that she experienced an exacerbation of symptoms with each successive dose of the HPV vaccine she received, that this is evidence of re-challenge, and that it supports her argument that she had a reasonable basis to file her petition. *Id.* at 6-7.

Respondent contests Petitioner's argument that her claims of vaccine-related injury had a reasonable basis. Fees Resp. at 11. Respondent argues that Petitioner's claims "are not substantiated by the medical records or a medical opinion," and that the vaccine package insert, without more, is insufficient to meet the "more than a mere scintilla of evidence" standard. *Id.*

Respondent further argues that the medical literature (Exs. 10-15) and the affidavit of Ms. Farjaszewska (Ex. 9) that Petitioner filed after dismissing her claim cannot support her claim of reasonable basis because at the time of filing, "there was no ongoing claim." Fees Resp. at 11 (citing *Goodgame v. Sec'y of Health and Hum. Servs.*, No. 17-339V, 2021 WL 5365635, at *10 (Fed. Cl. Oct. 29, 2021)).

In her reply, Petitioner reiterates that her symptoms were documented contemporaneously by the medical providers she saw, citing again to the records from Dr. Nemechek and Rita Kara Robinson. Fees Reply at 1-2. Petitioner argues that *Goodgame* is not well-reasoned, and that evidence submitted after the entitlement stage should be considered on a motion for attorney fees and costs. *Id.* at 3-4.

## VI. Legal Standard

### A. Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*,

No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B. Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in his claim. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *6-7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Instead, the claim must be supported by objective evidence. *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290; *see also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius*, 984 F.3d at 1380 (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis.").

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1).

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

### C. Elements of a *prima facie* Case

The Vaccine Act requires petitioners to provide objective evidence of five elements to make out a *prima facie* case for compensation:

1. The Petitioner received a vaccine set forth in the Vaccine Injury Table;

2. The Petitioner received a vaccine in the United States or outside of the United States under some special circumstances;

3. The Petitioner's injuries or death were caused by the vaccine (either by showing that the injury was one listed on the Vaccine Injury Table, or by making out a prima facie case of causation-in-fact), or the vaccine significantly aggravated a pre-existing injury;

4. The Petitioner experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and

5. The Petitioner has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death.

42 U.S.C. § 300aa-11(c)(1)(A)-(E). In order to establish reasonable basis, a Petitioner must present objective evidence as to each of these elements. *Cottingham*, 971 F.3d at 1344, 1345-46.

## VII. Discussion

### A. Good Faith

Petitioner argues that the medical record supports a finding of good faith because Petitioner's mother's suspicion that the HPV vaccine caused Petitioner's symptoms was documented in the medical record more than a year before the filing of the petition. Fees App. at 2-3. Petitioner further argues that the record contains no evidence of bad faith, and that she is thus entitled to the presumption of good faith under *Grice*. 36 Fed. Cl. at 121.

Respondent does not explicitly object to Petitioner's assertion of good faith in this case. Respondent notes in a footnote that "Counsel in this case represents a number of petitioners who appear to be 'passing through' the [Vaccine Program] in an effort to sue [HPV vaccine manufacturer] Merck civilly," and notes that Respondent has disputed assertions of good faith in other similar cases. Fees Resp. at 14 n. 4.

I agree with Petitioner's arguments. Although the standard for good faith has not been defined with specificity, I find that Petitioner has demonstrated that she filed her petition in good faith. In the first place, absent evidence that Petitioner acted in bad faith, she is entitled to a presumption that she acted in good faith under *Grice*. 36 Fed. Cl. at 121. Respondent does not point to evidence of bad faith in the record, and thus has not overcome the presumption.

Furthermore, Respondent notes that Petitioner is merely "passing through" the Vaccine Program in order to satisfy the statutory requirement before pursuing a civil claim against Merck. Fees Resp. at 14 n. 4. It is true that one of the procedural components of the Act "requires a claimant to first seek redress in the [Vaccine Court] before attempting to obtain relief in a court of general jurisdiction." *Romero v. Wyeth*, 145 Fed. Appx. 962, 964 (5th Cir. 2005). My colleagues and I have repeatedly found that withdrawal from the Vaccine Program to pursue civil litigation is not enough on its own to support a finding that Petitioner did not act in good faith. *See, e.g., Hoover v. Sec'y of Health and Hum. Servs.*, No. 20-1394V, 2021 WL 5575768, at *7 (Fed. Cl. Spec. Mstr. Nov. 1, 2021); *Ricci v. Sec'y of Health and Hum. Servs.*, No. 20-1420V, 2022 WL 2302209, at *8-9 (Fed. Cl. Spec. Mstr. June 2, 2022).

Accordingly, I find that Petitioner has satisfied the subjective standard for good faith.

### B. Reasonable Basis

Before turning to the objective reasonable basis inquiry, I first address Respondent's argument that Petitioner's medical literature and the affidavit of Ms. Farjaszewska do not support her motion for fees and costs because they were filed after the petition for compensation was dismissed. Respondent cites *Goodgame*, in which the court refused to consider medical literature filed after the Special Master had already denied entitlement to support a claim for attorneys' fees. 157 Fed. Cl. at 73 ("[T]he time for introducing these articles was BEFORE the Special Master issued his ruling on the merits, when they could aid his client's attempt to be compensated for her alleged injury, not AFTER his client had lost on the merits and they could only aid his attempt to collect fees.").

Respondent cites *Goodgame* for the proposition that evidence filed after the entitlement phase of a case has ended cannot support a reasonable basis, noting that in this case, "petitioner filed the subject medical literature solely for the purpose of attempting to support petitioner's request for attorneys' fees and costs." Fee Resp. at 11-12. As I have previously noted, "if Petitioner's attorneys are aware of evidence that may help their client, they have a responsibility to file this evidence at the earliest opportunity." *Contreras v. Sec'y of Health and Hum. Servs.,* No. 19-491V, 2022 WL 2302208, at *7 (Fed. Cl. Spec. Mstr. May 31, 2022) (declining to consider evidence on remand which Petitioner's counsel failed to file until the case went to the Court of Federal Claims for review despite being in possession of it during the entitlement phase). While I agree that it is generally preferable for petitioners to file evidence before a decision on the merits, especially if such evidence will assist in the prosecution of their claim, there are instances where filing evidence during the fees stage may also be appropriate. For example, in the case at bar, Petitioner decided to leave the Vaccine Program in order to pursue a claim against the vaccine manufacturer. Under these circumstances, it seems of little consequence whether she filed evidence in support of her application for fees after I dismissed her case but before she requested attorneys' fees and costs. The evidence would not have assisted Petitioner in the prosecution of her Vaccine Program claim because her intent was to exit the program and file a civil action.

Under the circumstances present in this case, I find that filing evidence in support of reasonable basis during the fee stage is not improper. Therefore I will consider the medical literature and affidavit Petitioner filed in my analysis of her reasonable basis claim.

11

Turning now to the question of reasonable basis, the only requirement of a prima facie case that is at issue here is causation (i.e., that the Petitioner's injuries were caused by the vaccine, or the vaccine significantly aggravated a pre-existing injury). To prevail on her reasonable basis claim, Petitioner's burden is to provide more than a mere scintilla of evidence in support of her causation argument. *James-Cornelius v. Sec'y of Health and Hum. Servs.*, 984 F.3d 1374, 1379 (Fed. Cir. 2021) (citation omitted). The court in *Cottingham v. Sec'y of Health and Human Services* cited to *Sedar v. Reston Town Center Property, LLC,* in which the Fourth Circuit defined "more than a mere scintilla" as "evidence beyond speculation that provides a sufficient basis for a reasonable inference of causation." 154 Fed. Cl. 790, 795 (2021) (citing 988 F.3d 756, 761 n.3 (4th Cir. 2021)).

Petitioner has submitted objective evidence concerning the following points: (1) Petitioner received doses of the HPV vaccine on November 7, 2016, August 8, 2017, and February 15, 2018; (2) she developed headaches, nausea, dizziness, abdominal pain, myalgia, and irregular menstrual cycle; and (3) headaches, nausea, dizziness, abdominal pain, myalgia are listed on the HPV vaccine package insert under the heading "Adverse Reactions," Ex. 10 at 6; (4) Kinoshita noted headaches and disturbed menstruation as post-HPV vaccine adverse events. Kinoshita at 1956; (5) Ozawa listed chronic headaches, and menstrual abnormality as two of the major symptoms of an HPV vaccine injury. Ozawa at 4; (6) Dr. Nemechek attributed Petitioner's intolerance of spicy and tomato-based foods to "[HPV] vaccine triggering bacterial overgrowth," Ex. 4 at 42.

An examination of Petitioner's proffered evidence demonstrates that she has provided more than a mere scintilla of objective evidence supporting a causal relationship between the administration of the HPV vaccine and the symptoms she has experienced.

First, the overlap between Petitioner's medical records and the adverse event information in the vaccine package insert supports her claim of a reasonable basis. Combined with a petitioner's medical records, a vaccine package insert can constitute evidence in support of causation for purposes of deciding reasonable basis. *Cottingham v. Sec'y of Health and Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (finding that the Special Master abused his discretion by concluding that petitioner had presented no evidence of a reasonable basis where petitioner had submitted the vaccine package insert and medical records showing some of the same symptoms). The documentation showing that Petitioner exhibited some of the same symptoms reported in clinical trials for the vaccine supports her argument that her claim had a reasonable basis.

Second, the Kinoshita article supports Petitioner's claim of reasonable basis. Among the post-vaccination signs and symptoms that the subjects reported to Kinoshita were disturbed menstruation and headaches. Kinoshita at 1956. Petitioner's medical records show that she experienced these signs and symptoms as well.

Third, Osawa listed chronic headaches and menstrual abnormality as major symptoms that support an HPV vaccine injury. Osawa at 4. Petitioner complained of these symptoms to her medical providers.

Finally, Dr. Nemechek attributed Petitioner's intolerance of spicy and tomato-based foods

12

to the "[HPV] vaccine triggering bacterial overgrowth," Ex. 4 at 42. In weighing evidence, special masters are expected to consider the views of treating doctors. *Capizzano v. Sec'y of Health and Hum. Servs.*, 440 F.3d 1317, 1326 (Fed. Cir. 2006). The views of treating doctors about the appropriate diagnosis are often persuasive because the doctors have direct experience with the patient whom they are diagnosing. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09-293V, 2015 WL 3640610, at *20 (Fed. Cl. Spec. Mstr. May 22, 2015). Dr. Nemechek's opinion in the record of his examination of Petitioner provides additional support for her reasonable basis claim.

Based on the totality of the evidence presented, I find that Petitioner has submitted more than a mere scintilla of evidence and has thus satisfied the reasonable basis standard.

## VIII. Reasonable Attorneys' Fees and Costs

Section 15(e)(1) of the Vaccine Act allows for the Special Master to award "reasonable attorneys' fees, and other costs." § 300aa–15(e)(1)(A)–(B). Petitioners are entitled to an award of reasonable attorneys' fees and costs if they are entitled to compensation under the Vaccine Act, or, even if they are unsuccessful, they are eligible so long as the Special Master finds that the petition was filed in good faith and with a reasonable basis. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008). Above, I determined that Petitioner is entitled to a final award of reasonable attorneys' fees and costs.

It is "well within the special master's discretion" to determine the reasonableness of fees. *Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); see also *Hines v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 313, 316–18 (2008).

Reasonable hourly rates are determined by looking at the "prevailing market rate" in the relevant community. *See Blum v. Stenson*, 465 U.S. 886, 895 (1984). The "prevailing market rate" is akin to the rate "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.* at 895, n.11. The petitioner bears the burden of providing adequate evidence to prove that the requested hourly rate is reasonable. *Id.*

### A. Attorneys' Fees

Petitioner requests a total of $10,491.50 in attorneys' fees. *See* Fees App., Ex. A; Supp. App., Ex. A.

1. <u>Reasonable Hourly Rates</u>

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's

attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorneys' experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[3]

Petitioner requests compensation for her counsel at the following rates: for Mr. Andrew Downing, $385.00 per hour for work performed in 2020 and 2021, and for Ms. Courtney Van Cott, $275.00 per hour for work performed in 2020 and 2021. Petitioner also requests compensation for two paralegals, Mr. Robert Cain and Ms. Danielle Avery, at a rate of $135 per hour for work performed in 2020 and 2021. These rates are consistent with what Mr. Downing, Ms. Van Cott, and their paralegals have previously been awarded for their Vaccine Program work. *See, e.g., Goff v. Sec'y of Health and Hum. Servs.*, No. 17-0259V, 2019 WL 3409976, at *2-3 (Fed. Cl. Spec. Mstr. Mar. 29, 2019). Accordingly, I find the requested rates to be reasonable and that no adjustment is warranted.

2. Reasonable Hours Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). Petitioner bears the burden of establishing that the rates charged, hours expended, and costs incurred are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 482, 484 (1993). However, special masters may reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 318 (Fed. Cl. 2008), *aff'd* No. 99-573V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008).

A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (Fed.

---

[3] The 2020 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202020.PPI_OL.pdf
The 2021 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2021-PPI-OL.pdf
The hourly rates contained within the schedules are updated from the decision in McCulloch, 2015 WL 5634323.

Cl. 2011). Special masters may look to their experience and judgment to reduce an award of fees and costs to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cl. 1993). It is within a special master's discretion to instead make a global reduction to the total amount of fees requested. *See Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("special masters have wide latitude in determining the reasonableness of both attorneys' fees and costs"); *Hocraffer v. Sec'y of Health & Hum. Servs.*, No. 99-533V, 2011 WL 3705153 (Fed. Cl. Spec. Mstr. July 25, 2011), mot. for rev. denied, 2011 WL 6292218, at *13 (Fed. Cl. 2011) (denying review of the special master's decision and endorsing "a global – rather than line-by-line – approach to determine the reasonable number of hours expended in this case").

While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g., McCulloch*, 2015 WL 5634323, at *26.

Petitioner's counsel has provided a breakdown of hours billed and costs incurred. Fees App., Ex. A; Supp. App., Ex. A. I find the hours to be reasonable and award them in full.

Total attorneys' fees to be awarded: **$10,491.50**

### B. Attorneys' Costs

Petitioner requests a total of $73.33 in attorneys' costs, specifically for obtaining medical records. Fees App., Ex. A. Documentation for all medical record requests was provided and the costs are reasonable. Thus, I award Petitioner's requested attorneys' costs in full.

Total attorneys' costs to be awarded: **$73.33**

### C. Petitioner's Costs

Petitioner requests a total of $400.00 in Petitioner's costs as reimbursement for the Court's filing fee, which she paid out of pocket prior to retaining counsel. Petitioner provided documentation of the payment and I award Petitioner the cost in full.

Total Petitioner's costs to be awarded: **$400.00**

## IX. Conclusion

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of final fee and cost awards, and based on the foregoing, I **GRANT** Petitioner's application, as follows:

A lump sum in the amount of **$10,564.83**, representing reimbursement of Petitioner's final attorneys' fees and costs in the form of a check jointly payable to Petitioner and her attorney, Andrew Downing.

A lump sum in the amount of **$400.00**, representing reimbursement of Petitioner's costs in the form of a check payable to Petitioner.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this decision.

**IT IS SO ORDERED.**

**s/ Katherine E. Oler**
Katherine E. Oler
Special Master